J-A12035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                 :            PENNSYLVANIA
                                 :
              v.                     :
                                 :
                                 :
FATEEN GROCE                    :
                                 :
             Appellant            :     No. 412 EDA 2022

Appeal from the Judgment of Sentence Entered November 3, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002098-2018

BEFORE: OLSON, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:         **FILED OCTOBER 17, 2023**

Fateen Groce appeals from the judgment of sentence entered following his convictions for rape of an unconscious person, sexual assault, and indecent assault.[1] He contends his prosecution was barred by the statute of limitations and argues a Confrontation Clause violation. He also challenges the sufficiency of evidence supporting the finding that he is a sexually violent predator (SVP). We affirm.

The victim called 911 in July 2002 to report a sexual assault. When police interviewed her, she told them that she was staying in the one-bedroom apartment of a friend, Kim Hadley, for a few months until they got an apartment together. The victim slept on the sofa, while Hadley used the bedroom. *See* Motion to Dismiss Pursuant to Statute of Limitations, Ex. A,

---

[1] 18 Pa.C.S.A. §§ 3121(a)(3), 3124.1, and 3126(a)(1), respectively.

Investigation Interview Record, 7/31/02, at 1 (unpaginated). Hadley had "passed out drunk" before the victim went to sleep. The victim told police that when she awoke in the morning, her vagina was wet and "smelled like sex." *Id.* However, she did not remember having sex or anyone touching her because she had taken Tylenol PM and was "knocked out." *Id.* She said she had had a male visitor, but he went home before she went to sleep at around 2:00 AM or 2:30 AM. *Id.* The victim stated she had left the apartment door unlocked, although the outside door leading to the apartments was locked. *Id.* The front door also leads to two other apartments. *Id.* at 2. The victim told Philadelphia police that one of those apartments was occupied by an older man, while she believed a woman and her children lived in the other apartment with one of the children's fathers. *Id.*[2]

When the victim woke up in the morning, Groce was in bed in Hadley's room, and the apartment door had been locked. *Id.* Groce had not been in the apartment when the victim went to sleep. *Id.* Hadley told the victim that Groce had keys to the apartment and had arrived around 4:00 AM, and that she had locked the apartment door after he arrived. *Id.* According to a police incident report, the victim told police that she believed "that she was raped by unk[nown] person[.]" Motion to Dismiss Pursuant to Statute of Limitations, Ex. C, Complaint or Incident Report, 7/31/02, at 1 (unpaginated).

_____

[2] *But see* Motion to Dismiss Pursuant to Statute of Limitations, Ex. D, Investigation Report, 8/5/02, at 1 (unpaginated) ("She stated that the other apartments are occupied by women and children with the exception of an elderly male that lives in the other 1st floor apartment.").

Police officers took the victim to the hospital where a rape kit was collected. *Id.* at 1; Motion to Dismiss Pursuant to Statute of Limitations, Ex. D, Investigation Report, 8/5/02, at 1 (unpaginated). Police conducted criminal history checks and found that Hadley had no prior record. Groce had five prior arrests for narcotics, theft, and simple assault. *See id.* at 2. Police submitted the rape kit for testing, which produced positive test results for sperm. *See* Motion to Dismiss Pursuant to Statute of Limitations, Ex. E, Criminalistics Laboratory Report, 8/16/02, at 1 (unpaginated). No DNA testing was performed, and police did not interview Hadley or Groce at that time.

The victim's rape kit was not subjected to DNA testing until 14 years later, in 2016, when Philadelphia received a grant and submitted a backlog of rape kits to private laboratories. *See* N.T. Trial, 12/2/2020, at 188. The victim's kit was sent to Bode Cellmark Forensics ("Bode Lab"), which produced a report dated July 2016 containing a DNA profile. Philadelphia police uploaded the DNA profile to the local Combined DNA Index System ("CODIS") database and sent the profile to the Pennsylvania State Police. In November 2017, the State Police informed Philadelphia that the DNA profile had matched Groce's DNA profile in the state CODIS database. Philadelphia police obtained a buccal swab from Groce that produced a DNA profile consistent with that obtained from the rape kit.

In January 2018, Police interviewed Hadley. She told them that she and Groce were asleep in her room on the morning in question. *See* Motion to Dismiss Pursuant to Statute of Limitations, Ex. B, Investigation Interview

Record, 1/31/18, at 2 (unpaginated). The bedroom door flew open, and police officers told her and Groce to get out of bed. According to Hadley, the victim pointed at Groce and said, "That bastard raped me." *Id.* at 2. On February 1, 2018, the Commonwealth charged Groce.

Groce moved to dismiss the case on the ground that the statute of limitations had run. The Commonwealth countered that a statutory exception for genetic identification evidence applied. That exception applies where evidence of certain offenses – including offenses with which Groce was charged – contains DNA that "is subsequently used to identify an otherwise unidentified individual as the perpetrator of the offense." 42 Pa.C.S.A. § 5552(c.1). In such cases, the prosecution for such offenses may begin either within the statute of limitations provided for the offenses or one year after the individual's identity is determined, whichever is later. *Id.* Groce maintained that the exception did not apply to him because he was not an "otherwise unidentified individual." He argued that this was so because police had identified him as a suspect during the investigation in 2002. The trial court denied Groce's motion.

Groce also filed a motion to suppress all forensic evidence including the 2016 Bode Lab Report. *See* N.T. Motion Volume 1, 1/10/20, at 21. Groce argued that the report was inadmissible and pursuant to the Confrontation Clause, the Commonwealth could only admit the report if they called the analyst who conducted the report. *Id.* at 21-23. The court denied Groce's motion. *See* N.T. Motion Volume 1, 1/10/20.

At Groce's bench trial, the Commonwealth presented the testimony of David Hawkins, a forensic scientist at the Philadelphia Police Department's DNA Laboratory.[3] He testified that he had conducted a full technical review of the Bode Lab's documentation to determine that all the laboratory work was done according to standard operating procedures and that the DNA profile listed in the 2016 Bode Lab Report was the same information that he observed in the raw data. *See* N.T. Trial at 162-78. According to the trial court,

> [a]fter Hawkin's technical review was completed, Brian Pfleegor, the forensic scientist who manages the PPD DNA Laboratory's local Combined DNA Index System (CODIS) database, uploaded the male DNA profile from the 2016 Bode Lab Report to the CODIS database and sent the information to the Pennsylvania State Police. *See* [N.T. Trial] at 185, 188-91. Eventually, the Pennsylvania State Police notified Pfleegor that the DNA profile uploaded in this case matched with [Groce's] DNA profile in CODIS. *See id.* at 188-89, 192. Pfleegor generated a CODIS Convicted Offender Match Report dated November 10, 2017, that reflected this information. *See id.* at 189-90; Exhibit C (hereinafter 2017 CODIS Report). At that point, Philadelphia police obtained a buccal swab from [Groce] that both parties stipulated had been placed on a property receipt numbered 3341824 that was dated February 2, 2018. *See* N.T. Trial at 191, 195-96, 201; Exhibit C-8.
>
> Finally, an DNA Laboratory Report dated March 28, 2018, and signed by Lynn Haimowitz concluded that the DNA profile observed in [Groce's] buccal swab was consistent with the DNA profile detected in the sample from [the victim's] cervical swab; "[e]xcluding an identical twin, Fateem Groce is the source of the DNA detected in these samples." *See* Exhibit C-10 (hereinafter 2018 DNA Lab Report).

---

[3] Groce objected to the Commonwealth calling Hawkins as a witness, raising the same Confrontation Clause argument as he made in his motion to suppress. *See* N.T. Trial, 12/2/20, at 148.

Trial Court Opinion, filed 7/20/22, at 1-3 (footnotes omitted).

The court found Groce guilty of the above-referenced offenses. The Commonwealth then moved to have him declared a Sexually Violent Predator. The court conducted an SVP hearing at sentencing, and the Commonwealth presented the testimony of a licensed psychologist, Dr. Cristine Dudley, who had evaluated Groce for the Sexual Offenders Assessment Board. The Commonwealth also introduced into evidence Dr. Dudley's expert report. Dr. Dudley testified that she did not interview Groce because he had declined to be interviewed. *See* N.T. Sentencing Hearing, 11/3/21, at 13. However, she maintained that this did not inhibit her assessment. *Id.*

Dr. Dudley testified that she concluded that Groce was an SVP after considering several factors, including, but not limited to, the facts surrounding the case, Groce's criminal history, and any mental illness, disability, or abnormality from which Groce suffered. *Id.* at 15-20. Dr. Dudley stated that Groce had previously been diagnosed with "personality disorder not otherwise specified" during a mental health evaluation, and she found he met the criteria for antisocial personality disorder. *Id.* at 20. She based her diagnosis on Groce's "pervasive disregard for and violation of the rights of others since he was 12. His criminal versatility, his arresting conviction record and misconduct charges incurred while incarcerated." *Id.* She stated that the diagnosis was also based on Groce "having several different alias[es], not admitting to sexually assaulting [the victim] despite knowing her or seeing her distressed the day that she discovered that she had been sexually violated." *Id.* at 20-

21. She testified that though Groce had not been convicted of any sex crimes since 2002, "he has displayed personal violence" consistent with antisocial personality disorder. *Id.* at 40, 41.

Dr. Dudley also stated that she found Groce's actions were predatory. *Id.* at 24. She explained that "he went into where the victim was located and sexually assaulted [the victim], despite seeing that she was unconscious . . . for the sole purpose of meeting his sexual needs without regard to her health and well-being." *Id.*

Dr. Dudley also found Groce likely to re-offend:

> Mr. Groce has engaged in illegal behavior since he was 12 years old, if not earlier. He has had multiple arrests and convictions as an adult, and it is evident that Mr. Groce has a wanton disregard for the rules of society and the rights of others, and he will engage in sexual behaviors with people against their will when having the opportunity to meet his own needs.

*Id.* at 22.

The court found Groce was an SVP and sentenced him to five to 10 years in prison. Groce filed a post-sentence motion challenging the weight of the evidence. The court denied the motion, and this timely appeal followed.

Groce argues the following issues:

I.    Where the accuser provided police with [Groce's] name as the assailant on the day of the alleged crime, does the five-year applicable statute of limitations bar the filing the criminal complaint on the current charges fifteen years later, thereby requiring a dismissal?

II.    Was there a violation of Mr. Groce's Confrontation Clause rights pursuant to the Federal and State

Constitutions where inadmissible testimonial forensic reports were used to establish an essential element of the offenses – identity – and were the only proof of that element?

III. Was the evidence insufficient to find by clear and convincing proof that Mr. Groce is a sexually violent predator?

Groce's Br. at 4 (answers of trial court omitted).

Groce maintains that the statute of limitations barred the Commonwealth from prosecuting him. He argues that Section 5552(c.1) does not apply here because he was not an "otherwise unidentified individual." *See* 42 Pa.C.S.A. § 5552(c.1). He states that at trial, the victim testified that she told police that Groce was the perpetrator on the day of the incident. He asserts that Hadley testified that the victim barged into her room and said, "[T]hat bastard raped me, pointing her finger at [Groce]." Groce's Br. at 18, 19 (citing N.T. Trial, at 116).

Noting that Section 5552(c.1) does not define an "otherwise unidentified individual," Groce maintains that the plain meaning of the words precludes their application to him. He argues that a person is not "unidentified" if "their identity is known to the police and the police possess probable cause or more to investigate or charge that person with a crime." *Id.* at 25. Groce argues that "[i]n every possible way" he was "'identified' as the suspect to police" such that Section 5552(c.1) is inapplicable. *Id.* at 27.

Statutory interpretation is a question of law. Our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Giulian*, 141 A.3d 1262, 1266 (Pa. 2016). Our task in conducting statutory construction

- 8 -

is to ascertain and effectuate the General Assembly's intent. 1 Pa.C.S.A. § 1921(a). "A statute's plain language generally provides the best indication of legislative intent." *Giulian*, 141 A.3d at 1267. "In construing the language, however, and giving it effect, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Id.* (citation and internal quotation marks omitted). "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S.A. § 1903(a). We may examine dictionary definitions when determining the ordinary meaning of words and phrases. *See Commonwealth v. Gamby*, 283 A.3d 298, 307 (Pa. 2022). In ascertaining the intent of the General Assembly, we presume that it "does not intend a result that is absurd, impossible of execution],] or unreasonable." 1 Pa.C.S.A. § 1922(1); *see Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 55 A.3d 1056, 1068 (Pa. 2012).

The statute at issue, Section 5552(c.1), provides:

> **Genetic identification evidence.**--Notwithstanding any provision of law to the contrary, if evidence of a misdemeanor sexual offense set forth in subsection (c)(3) or (3.1) or a felony offense is obtained containing human deoxyribonucleic acid (DNA) which is subsequently used to identify an otherwise unidentified individual as the perpetrator of the offense, the prosecution of the offense may be commenced within the period of limitations provided for the offense or one year after the identity of the individual is determined, whichever is later.

42 Pa.C.S.A. § 5552(c.1).

Merriam-Webster defines "unidentified" as "not having a known or established identity." *Unidentified*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/unidentified (accessed 9/20/23). Similarly, Brittanica Dictionary defines "unidentified" as "not known or identified." *Unidentified*, Brittanica Dictionary, https://www.britannica.com/dictionary/unidentified (accessed 9/20/23).

We read Section 5552(c.1) as applying where DNA evidence has been used to identify a person otherwise "not having a known or established identity" as the perpetrator of the offense. Groce's suggested reading – that "unidentified" means only persons whose identities are unknown to police – is absurd and unreasonable. Employing that definition would result in the extension being inapplicable to many people whom authorities had no basis to suspect but whose names they nonetheless knew. ***Cf. Commonwealth v. Shiffler***, 879 A.2d 185, 194(Pa. 2005) (choosing alternative construction of mandatory sentencing provision to avoid absurd incongruity with graduated sentencing scheme).

Groce was "an otherwise unidentified individual as the perpetrator of the offense." The Commonwealth first obtained DNA evidence identifying the perpetrator of the victim's rape in 2017. Although the police knew of Groce in 2002, the record does not show that he was identified at that time as the perpetrator of the victim's rape. The victim did not identify Groce as her attacker when she gave her statement to the police in 2002. In fact, according to her statement, she did not remember anyone touching her body. ***See***

Defense Exhibit 1. Although Hadley testified at trial that the victim had accused Groce in 2002, the record shows that the Commonwealth did not know this information until Hadley gave her statement in 2018, *after* the Commonwealth had filed charges against Groce. ***See*** N.T. Trial, at 119 (Hadley agreeing that she did not give a statement to police until January 2018). The record refutes Groce's claim that he was not an "unidentified individual as the perpetrator of the offense."

Next, Groce alleges that his Confrontation Clause rights were violated when the trial court allowed the Commonwealth to admit the Bode Lab Report into evidence. He directs our attention to ***Commonwealth v. Yohe***, 79 A.3d 520 (Pa. 2013), stating that forensic reports are testimonial. Groce's Br. at 28. As such he maintains there is "no question" as to whether the report was testimonial in nature. ***Id.*** at 31. He notes Hawkins was not an employee of Bode and was not "involved either directly or as a supervisor in the analysis or preparation of the report." ***Id.*** at 30. Because the Commonwealth did not have the analyst of the report testify, Groce argues that the court violated his right to confrontation and this error was not harmless.

A claim that an appellant's right to confront a witness under the Confrontation Clause of the United States and Pennsylvania Constitutions is a question of law. ***See Commonwealth v. Yohe***, 39 A.3d 381, 384 (Pa.Super. 2012). Our standard of review is *de novo* and our scope of review is plenary. ***Id.***

The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI; *see also Commonwealth v. Geiger*, 944 A.2d 85, 97 n.6 (Pa.Super. 2008) ("Pennsylvania's Constitution affords the same protection as its federal counterpart with regard to the Confrontation Clause"). This right to confrontation "applies to witnesses against the accused – in other words, those who bear testimony. Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (cleaned up). The confrontation right extends to forensic or scientific reports that are testimonial in nature. *See Commonwealth v. Brown*, 185 A.3d 316, 319 n.3 (Pa. 2018).

Even assuming purely for purposes of argument that there was a Confrontation Clause violation here, the admission of the 2016 Bode Lab Report was at most harmless error. Harmless error analysis applies to claims of Confrontation Clause violations, and we may raise harmless error *sua sponte*. *See id.* at 330; *Commonwealth v. Holt*, 273 A.3d 514, 540 (Pa. 2022).

An error is harmless where:

(1) it did not prejudice the defendant or the prejudice was *de minimis*; or

(2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Green**, 162 A.3d 509, 519 (Pa.Super. 2017) (*en banc*) (emphasis omitted).

Here, we find the third category applies: any confrontation error was harmless because the "properly admitted and uncontradicted evidence" of Groce's guilt was overwhelming and any prejudicial effect of the claimed error was so insignificant that it could not have contributed to the verdict. The victim's rape kit tested positive for sperm and Groce was the only male in the apartment while she was sleeping. The victim also testified that she did not remember having sex with anyone when she went to sleep that night. Most damning, according to the DNA recovered from the buccal swab, which was not submitted to Bode Lab, excluding an identical twin, Groce was the source of the DNA recovered from the victim's rape kit.

Groce's final claim challenges the court's acceptance of Dr. Dudley's conclusion that Groce qualified as an SVP. He claims that Dr. Dudley's assessment was based on "fallible and minimal information that did not comport with the record." Groce's Br. at 43. He challenges Dr. Dudley's diagnosis of antisocial personality disorder on the ground that such a diagnosis was not reflected in Groce's prior mental health evaluation. Groce also maintains that Dr. Dudley's conclusion ignored many of the factors to be considered during an SVP assessment.

- 13 -

"We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied." *Commonwealth v. Fuentes*, 991 A.2d 935, 942 (Pa.Super. 2010) (citation omitted). We view the evidence of record in the light most favorable to the Commonwealth. *See id.*

A sexually violent predator is defined as:

> A person who has been convicted of a sexually violent offense set forth in Section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.

*Commonwealth v. Leatherby*, 116 A.3d 73, 84 (Pa.Super. 2015) (citation omitted). The evidence must also show that the defendant's conduct was predatory. *See id.* "The salient inquiry to be made by the trial court is the identification of the impetus behind the commission of the crime and the extent to which the offender is likely to reoffend." *Commonwealth v. Morgan*, 16 A.3d 1165, 1169 (Pa.Super. 2011) (quoting *Fuentes*, 991 A.2d at 943) (emphasis omitted). However, a likelihood of re-offense is not required for an SVP designation. *See id.* at 1169, 1173.

While Groce claims that Dr. Dudley ignored many of the factors of consideration for an SVP assessment, he fails to specify the factors she allegedly ignored. Our review of the record shows that Dr. Dudley thoroughly testified regarding the evidence or lack thereof for each factor. *See* N.T. Sentencing Hearing, 15-21. She also testified that based on Groce's antisocial

personality diagnosis, Groce has a mental abnormality that makes it likely that he will re-offend. She explained that Groce has engaged in criminal activity since the age of 12, had multiple arrests and convictions as an adult, and had a "wonton disregard for the rules of society and the rights of others[.]" *Id.* at 22. In line with his antisocial personality traits, Dr. Dudley concluded that Groce "will engage in sexual behaviors with people against their will when having the opportunity to meet his own needs." *Id.* To the extent Groce maintains that her diagnosis was improper because it allegedly did not comport with his prior mental health assessment, any such inconsistency goes to the weight and not the sufficiency of the evidence. It is not so grave an inconsistency as to render the evidence less than clear and convincing. Viewed in the light most favorable to the Commonwealth and considering the Commonwealth's burden, the evidence supporting the SVP determination was sufficient.

Judgment of sentence affirmed.

Judge Nichols joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/17/2023